UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| **AFFILIATED FOODS MIDWEST COOPERATIVE, INC.,** ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> **WOLF CREEK MARKETPLACE,** ) <br> et al., ) <br> ) <br> ) <br> Defendants. ) <br> _____) | Case No. 10-2012-JAR |

## MEMORANDUM AND ORDER

This case involves a contract dispute between plaintiff Affiliated Foods Midwest Cooperative, Inc. ("AFM"), a cooperative grocery store distributorship, and one of its member stores, Wolf Creek Marketplace ("Wolf Creek"). Defendants Ed McIntosh, John Bell, and Kevin Barclay are each shareholders of Wolf Creek. Before the Court is plaintiff AFM's Motion for Partial Summary Judgment (Doc. 47), on Counts I, III, IV, V, and VI of the Complaint. The motion is fully briefed and the Court is prepared to rule. As described more fully below, the Court denies plaintiff's motion for summary judgment.

### I. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."[1]  A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[2]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[3]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[4]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[5]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[6]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[7]  If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."  When the moving party also bears the burden of proof at trial,

> a more stringent summary judgment standard applies. Thus, if the moving party bears the burden of proof, to obtain summary judgment, it cannot force the nonmoving party to come forward with "specific facts showing there [is] a genuine issue for trial" merely by pointing to parts of the record that it believes illustrate the absence of a genuine issue of material fact. Instead, the moving party must establish, as a matter of law, all essential elements of

---

[1] Fed. R. Civ. P. 56(c).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3] *Id.*

[4] *Id.* at 251–52.

[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[6] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[7] *Id.*

2

the issue before the nonmoving party can be obligated to bring
forward any specific facts alleged to rebut the movant's case.[8]

When examining the underlying facts of the case, the Court is cognizant that all inferences must be viewed in the light most favorable to the nonmoving party and that it may not make credibility determinations or weigh the evidence.[9]

## II. Uncontroverted Facts

On July 24, 2008, Wolf Creek entered into an AFMC Wholesale – Retail Supply Agreement with AFM ("Supply Agreement"). In the Supply Agreement, AFM agreed to extend credit of up to $800,000 to Wolf Creek for initial store inventory, subject to the terms of the Supply Agreement. Wolf Creek's opening inventory balance was at least $544,973.10.

Pursuant to the Supply Agreement, Wolf Creek agreed to:

> Maintain inventories at commercially reasonable levels . . . .
> Allow AFM, at Retailer's expense to conduct up to quarterly
> inventories by a reputable inventory company of AFM's selection.
> Maintain inventories at a level no lower than 95% of opening
> inventory . . . . If this requirement is not met, Retailer understands
> AFM will have the absolute right to apply any refunds or
> patronage rebates otherwise due to Retailer to reduce outstanding
> Retailer debt. If the inventory falls below 80% of the opening
> inventory, or if AFM reasonably deems itself insecure for any
> reason it, in its sole discretion deems reasonable, then AFM shall
> have the absolute right to demand full payment, cease supply,
> require different terms, or impose other requirements it deems
> prudent. Retailer shall have no grace period to cure any default.[10]

The Supply Agreement further provides: "If default occurs, the entire unpaid balance shall be

---

[8] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (citations omitted).

[9] *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[10] (Doc. 48, Ex. 4 at 2.)

3

due in full immediately and Retailer shall pay all litigation or other collection costs."[11]

On January 3, 2010, Wolf Creek's inventory was $362,560.28. Wolf Creek continued to order inventory from plaintiff until February 11, 2010 and continued to make payments as invoiced until March 11, 2010. Within five days of the January 3, 2010 inventory, orders had been placed for more than $87,000 worth of inventory, which equates to more than 80% of the opening inventory. At all times, Wolf Creek's inventory was commercially reasonable.

The Supply Agreement provides:

> Each individual who signs below with Retailer does unconditionally personally guarantee full, prompt performance of all of Retailer's obligations hereunder, and full prompt payment of all debt owed to AFM, of any kind, in any amount, arising in any way or at any time. Notice of breach, default, nonpayment, proceedings for collection, repossession, cessation of credit, cessation or alteration of terms for supply, are each a [sic] all waived by Retailer and each of the undersigned.[12]

The Supply Agreement also states that "Retailer [defined in the Agreement as Wolf Creek and defendants McIntosh, Bell, and Barclay] shall be liable for all AFM damages for breaching this Agreement . . . . Attorney's fees and litigation costs may be recovered against any party committing a material breach of this Agreement," and that "[a]ll guarantors executing this Agreement guarantee, unconditionally, Retailer's complete and absolute performance of this Agreement and all obligations associated with it."[13] Signatures for defendants McIntosh, Bell, and Barclay appear directly below these paragraphs of the Supply Agreement and defendants McIntosh and Barclay admit that they signed the Supply Agreement as guarantors. However,

---

[11]*Id.*

[12]*Id.* at 3–4.

[13]*Id.* at 5.

4

defendant Bell understood that he was merely signing the Supply Agreement as a representative of Wolf Creek, not as a guarantor.

## III. Discussion

Plaintiff moves for summary judgment on Counts I and III–VI. Count I alleges a claim for breach of contract against defendant Wolf Creek. Counts III through V allege breaches of the guaranties by each of the individual defendants. Count VI seeks declaratory relief on plaintiff's claims. Plaintiff argues on summary judgment that there is no genuine issue of material fact that defendants breached the Supply Agreement by allowing Wolf Creek's inventory to fall below 80% of the opening inventory and failing to make full payment upon demand, and that the individual defendants breached because they failed to satisfy Wolf Creek's obligations under the Supply Agreement as guarantors. Defendants argue that the contract required Wolf Creek to maintain "commercially reasonable" inventory levels, which they complied with, and that there is a genuine issue of material fact about whether the individual defendants signed the Supply Agreement as guarantors. Defendants further argue that plaintiff has waived its claim for breach of contract by continuing to supply inventory and accept payment after the alleged breach by Wolf Creek.

### A. *Inventory Levels*

The Supply Agreement provides that Nebraska law governs this matter. Under Nebraska law, a contract is generally presumed to "correctly express the intention of the parties to it."[14] When a court interprets a contract, it "must determine as a matter of law, whether the contract is

---

[14]*Artex, Inc. v. Omaha Edible Oils, Inc.*, 463 N.W.2d 146, 150 (Neb. 1989).

ambiguous."[15] A contract is enforced according to its terms, only when it is written in clear and unambiguous language.[16] However, "a contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings."[17] If an ambiguity exists, a court "is not free to rewrite a contract or to speculate as to terms of the contract which the parties have not seen fit to include."[18] Instead, the interpretive meaning of the ambiguous provision is a question of fact, and is question for the finder of fact.[19]

Wolf Creek asserts that it did not breach the Supply Agreement because it maintained a commercially reasonable level of inventory, as required by the second sentence of section 2, paragraph 4. Wolf Creek comes forward with evidence that it is customary and reasonable within the grocery industry for a store to reduce its level of inventory in order to perform a physical inventory count. Further, Wolf Creek claims that its inventory level went back above 80% of the original inventory within one week. AFM insists that Wolf Creek's inventory level dropped below the 80% benchmark set forth later in the paragraph, entitling AFM to demand full payment under the explicit terms of the Supply Agreement. Because Wolf Creek failed to pay AFM in full, AFM argues that there is no genuine issue of material fact that Wolf Creek is in breach of the Supply Agreement.

When determining ambiguity under Nebraska law, a specific provision will control over a

---

[15]*Davenport, L.P. v. 75th & Dodge I, L.P.*, 780 N.W.2d 416, 422 (Neb. 2010); *see also Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1040–41 (8th Cir. 2000).

[16]*Lexington Ins. Co. v. Entrex Commc'ns Servs., Inc.,* 749 N.W.2d 124, 132 (Neb. 2008).

[17]*Davenport*, 780 N.W.2d at 422.

[18]*Id.* at 423.

[19]*Id.*

6

more general one where the provisions relate to the same issue.[20] Therefore, the specific provision requiring Wolf Creek to maintain inventory above 80% of its original level will control over the general provision requiring a commercially reasonable level of inventory. The Court finds as a matter of law that the Supply Agreement unambiguously provides that if Wolf Creek's inventory falls below 80% of the opening inventory, AFM has the absolute right to demand full payment. It is uncontroverted that AFM exercised this right after it determined that Wolf Creek's inventory fell below 80% of the opening inventory and it is uncontroverted that Wolf Creek did not pay the amount due. That Wolf Creek's inventory levels were commercially reasonable, despite the fact that they were below the 80% of opening inventory explicitly required by the contract, is not material to the Court's determination on summary judgment that the Supply Agreement is unambiguous because the specific provision controls over the more general requirement that Wolf Creek maintain commercially reasonable inventory levels. Moreover, the Supply Agreement is clear that there is no grace period to cure any defaults. By the clear terms of the Supply Agreement, AFM was entitled to demand payment in full.

### B. *Waiver*

Defendants have asserted the affirmative defense of waiver based on plaintiff's continued supply of inventory and acceptance of payment under the Supply Agreement after the breach. A waiver is "a party's voluntary and intentional relinquishment or abandonment of a known legal right, advantage, benefit, claim, or privilege, which except for the waiver, that party would have enjoyed."[21] To establish a waiver of some legal right, there must be clear, unequivocal, and

---

[20] *Neb. Pub. Power Dist.*, 234 F.3d at 1040; *Krzycki v. Genoa Nat'l Bank*, 496 N.W.2d 916, 921–22 (Neb. 1993); *Panwitz v. Miller Farm-Home Oil Serv., Inc.*, 228 Neb. 220, 223-24 (Neb. 1988).

[21] *Battle Creek State Bank v. Haake*, 587 N.W.2d 83, 89-90 (Neb. 1998).

decisive action of a party showing such purpose, or acts amounting to estoppel on his or her part.[22] Waiver can be demonstrated or inferred from a party's conduct.[23] Generally, where a party to a contract has knowledge of breach by the other party, yet continues to receive money in the performance of the contract, the breach will be deemed to have been waived.[24]

There is no genuine issue of material fact that plaintiff did not expressly waive its right to recover for defendants' breach. Defendants can point to no oral or written statements of waiver. Instead, defendants contend that plaintiff impliedly waived its right to pursue a claim for breach of contract by continuing to perform under the contract even after it filed the Complaint in this matter. AFM filed the Complaint within one week of its discovery that Wolf Creek's inventory fell below 80% of the opening inventory. However, defendants point to evidence that AFM continued to send inventory and invoices, and to accept payments under the terms of the Supply Agreement. Plaintiff counters that sending inventory and accepting payment does not undermine the clear and unequivocal assertion of its legal rights demonstrated by filing the Complaint.

The Court finds there is a genuine issue of material fact as to the affirmative defense of waiver. Neither party has moved for summary judgment on this issue, instead, defendants raise it in response to plaintiff's motion. Because defendants have pointed to evidence in the record to suggest that plaintiff impliedly waived its right to contest defendants' breach by continuing to perform under the Supply Agreement, summary judgment is not appropriate. A reasonable jury could conclude that defendants' affirmative defense of waiver bars plaintiff's breach of contract

---

[22]*Jelsma v. Scottsdale Ins., Co.*, 437 N.W.2d 778, 785 (Neb. 1989).

[23]*Haake*, 587 N.W.2d at 90.

[24]*Pearce v. ELIC Corp.*, 329 N.W.2d 74,79 (Neb. 1982) (citing 17 Am. Jur. 2d Contracts § 396); *Einot, Inc. v. Einot Sales Co.*, 49 N.W.2d 625 (Neb. 1951).

claim set forth in Count II.

AFM cites the Nebraska Supreme Court's decision in *Wheat Belt Public Power District v. Batterman*,[25] in support of its contention that invoicing for inventory and accepting payment from Wolf Creek did not constitute a waiver. *Batterman* considered whether a party's acceptance of payments made by a third-party to a contract amounted to consent to substitute the person obligated to make payment under the contract. In addition to finding no evidence of novation, the Court found that the plaintiff's acceptance of payment from a third-party for electricity did not reflect clear and unequivocal action showing an intent to discharge the defendant from liability on the contract.[26] In contrast, this case asks the Court to consider whether there is a waiver between the original parties to a contract. The question in this case is whether AFM waived its right to pursue a claim for breach of contract when it continued to transact business with Wolf Creek pursuant to their agreement after the alleged breach occurred. Defendants have pointed to evidence that, if believed by a reasonable jury, would support their affirmative defense of waiver. Summary judgment is, therefore, denied on plaintiff's claims for breach of contract.

### C.     *Defendants Bell, McIntosh, and Barclay's Liability as Guarantors*

Plaintiff further seeks summary judgment against the individual defendants in this matter in their capacity as guarantors under the Supply Agreement. It is undisputed that all three defendants signed the Supply Agreement; however, they purport to controvert the fact that they signed the Supply Agreement as guarantors.

---

[25] 452 N.W.2d 49 (Neb.1990).

[26] *Id.* at 52–53.

According to Nebraska law, "[a] guaranty is a collateral undertaking by one person to answer for the payment of a debt or the performance of some contract or duty in case of the default of another person who is liable for such payment or performance in the first instance."[27] Furthermore, "[a] guaranty is interpreted using the same general rules as are used for other contracts."[28] The Court finds that the Supply Agreement is unambiguous. It provides that the individuals who sign "with Retailer" "unconditionally personally guarantee full, prompt performance of all of Retailer's obligations hereunder, and full prompt payment of all debt owed to AFM, . . ." The contract was signed by Barclay on behalf of Wolf Creek, and by McIntosh, Bell, and Barclay separately underneath the signature block for Wolf Creek. Moreover, defendants Barclay and McIntosh admitted in their Answers that they signed the Supply Agreement as guarantors.[29] Therefore, there is no genuine issue of material fact that defendants Barclay and McIntosh signed the Supply Agreement as guarantors.

Defendant Bell did not admit in his Answer that he signed the Supply Agreement as a guarantor and continues to maintain that he did not sign the Supply Agreement as a guarantor. Bell points to the fact that Richard York signed the Supply Agreement for AFM as an individual and that he was not actively involved in the operation of Wolf Creek. Bell understood that he was signing the contract on behalf of Wolf Creek, not as a guarantor. But it is well-established in the law that absent fraud, a party is presumed to have knowledge of the contents of a contract

---

[27]*Northern Bank v. Dowd*, 562 N.W.2d 378, 379 (Neb. 1997).

[28]*Nogg Bros. Paper Co. v. Bickels*, 446 N.W.2d 729, 731 (Neb. 1989).

[29](Doc. 14 ¶ 4; Doc. ¶ 4.)

he signed and cannot avoid the contract based on a lack of understanding of the terms.[30] The terms of the Supply Agreement are clear that all individuals signing on behalf of Wolf Creek would be deemed guarantors. Therefore, the Court finds there is no genuine issue of material fact as to whether the individual defendants may be held liable as guarantors under the contract. However, because defendants have pointed to a genuine issue of material fact on this issue of waiver, summary judgment is not appropriate on plaintiff's guaranty claims.

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiff's Motion for Partial Summary Judgment (Doc. 47) is **denied**.

**IT IS SO ORDERED**.

Dated: January 24, 2011

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

.

---

[30]*Ray Tucker & Sons, Inc. v. GTE Directories Sales Corp.*, 571 N.W.2d 64, 68 (Neb. 1997). (citing *General Motors Acceptance Corp. v. Blanco*, 149 N.W.2d 516 (Neb. 1967)).